Filed:  November 14, 2002

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 01-2312
(CA-00-1771-DKC)

Marion Gray-Hopkins, etc.,

Plaintiff - Appellee,

versus

Prince George's County, Maryland, et al.,

Defendants - Appellants.

O R D E R

The court amends its opinion filed October 30, 2002, as follows:

On page 12, second full paragraph, lines 6-7 -- the sentence is corrected to read "Neither statutory nor common law immunity is available to a Maryland public official who acts with malice."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MARION GRAY-HOPKINS, in her
individual capacity, as mother,
Personal Representative and next
friend of Gary Hopkins, Deceased,
    *Plaintiff-Appellee,*

    v.

PRINCE GEORGE'S COUNTY,
MARYLAND; BRIAN C. CATLETT, A
Police Officer of Prince George's
County, Maryland,
    *Defendants-Appellants,*

    and                    No. 01-2312
PRINCE GEORGE'S COUNTY POLICE
DEPARTMENT; JOHN DOE, A Police
Officer of Prince George's County,
Maryland and Supervisor of Brian
Catlett; DEVIN C. WHITE, A Police
Officer of Prince George's County,
Maryland; JAMES SKYRM, A Police
Officer of Prince George's County,
Maryland and Supervisor,
    *Defendants.*

JOHN S. FARRELL,
    *Movant.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CA-00-1771-DKC)

Argued: April 2, 2002

Decided: October 30, 2002

Before MOTZ, Circuit Judge, Walter K. STAPLETON, Senior Circuit Judge of the United States Court of Appeals for the Third Circuit, sitting by designation, and W. Craig BROADWATER, United States District Judge for the Northern District of West Virginia, sitting by designation.

---

Reversed and remanded by published opinion. Senior Judge Stapleton wrote the opinion, in which Judge Motz and Judge Broadwater joined.

---

**COUNSEL**

**ARGUED:** Crystal Renee Mittelstaedt, COUNTY ATTORNEY'S OFFICE, Upper Marlboro, Maryland, for Appellants. Walter L. Blair, College Park, Maryland; C. William Michaels, Baltimore, Maryland, for Appellee. **ON BRIEF:** Sean D. Wallace, County Attorney, John A. Bielec, Deputy County Attorney, Upper Marlboro, Maryland, for Appellants. Johnnie L. Cochran, Jr., THE COCHRAN FIRM, New York, New York, for Appellee.

---

**OPINION**

STAPLETON, Senior Circuit Judge:

This civil rights action arises from an incident in which a Prince George's County police officer killed the son of plaintiff/appellee, Marion Gray-Hopkins. The officer, Brian Catlett, appeals from the District Court's denial of his motion for summary judgment based on a claim of qualified immunity. He and the County also appeal from the District Court's refusal to grant them summary judgment with respect to certain of Gray-Hopkins' state law claims.

### I. *BACKGROUND*

Officer Catlett shot and killed Gary Hopkins, on November 27, 1999, following a dance at the West Lanham Fire Department in

2

Prince George's County, Maryland. The parties hotly dispute the events leading up to this shooting. The District Court reviewed both parties' version of the facts and found sufficient evidence, in the form of witness affidavits and DNA analysis, to support each of those proffered versions.

According to appellants, after the dance a fight broke out in the parking lot. Two off-duty police officers working as private security guards at the dance, Officers Catlett and Marriott, were at the scene. A crowd formed, which they were unable to disperse. Catlett called the dispatcher to send on-duty officers to assist.

The occupants of a cream-colored Cutlass and a black, four-door Cadillac were the primary participants in the fighting. Marriott heard a person in the crowd state that an individual in the Cutlass had a gun. The information regarding the presence of the gun was radioed to the other officers who were on their way to the scene. Officer Devin White was one of these officers who heard this information as he approached the firehouse.

When White arrived at the firehouse, he stopped his marked police vehicle in the front of the driveway. The Cutlass was not moving when White approached it with his gun drawn. He then asked those in the vehicle several times to let him see their hands. The passenger in the front seat got out of the vehicle and disappeared into the crowd. The driver complied with White's request. Gary Hopkins was sitting in the rear of the vehicle. He did not raise his hands, but instead reached out of the car and grabbed at White's gun. Officer White then backed away from the Cutlass with his gun still in his hands. Gary Hopkins then got out of the car.

White continued to back away from the car. He ordered Hopkins, who was then completely out of the car to "Stop. Let me see your hands." Hopkins and White then struggled for control of White's weapon. In the course of this struggle, White repeatedly yelled for Hopkins to "Get off, let go, let me see your hands." While still engaging in a struggle with Hopkins over the control of his weapon, White heard a shot, which apparently forced Hopkins to let go of the weapon. Catlett fired that gunshot, which fatally struck Gary Hopkins.

In support of their version of events, appellants rely upon the deposition testimony of Dr. Fowler and Agent Smrz. According to Dr. Fowler, Hopkins had a laceration on his left index finger that was caused by the sharp edge of the front sight of a Beretta handgun issued by the Prince George's County Police Department. Hopkins' DNA was recovered from White's handgun, according to Agent Smrz's testimony.

The appellees present a strikingly different account of the events leading up to the shooting. Although appellees do not dispute that a "scuffle" ensued after the dance was shut down around 2:30 a.m., they present testimony that Hopkins was a peacemaker. He suggested that everyone should leave the parking lot and go to his mother's house. As the car Hopkins was riding in was attempting to exit the parking lot, White stopped the car. After Hopkins exited the vehicle, he was in a neutral position with his hands raised and at no point threatened White or grabbed his gun. According to a witness, Tyrone Freeman, Hopkins' hands were raised and he was facing White when Catlett fired his gun.

The District Court found material facts to be in dispute, and viewing the facts in the light most favorable to Gray-Hopkins, held that Catlett was not entitled to summary judgment on his claim for qualified immunity. Specifically, the Court found that there was a genuine dispute as to whether excessive force was used and whether a reasonable officer would have known that his actions were unlawful. The District Court further held that summary judgment was not warranted on certain of Gray-Hopkins' state law claims.

## II. *THE FEDERAL CLAIM*

Gray-Hopkins asserts that Catlett used excessive force against her son in violation of his rights under the Fourth and Fourteenth Amendments. Catlett insists that he is entitled to qualified immunity from suit on this claim. He is entitled to that immunity unless a reasonable officer in his position would have known that firing his weapon at Gary Hopkins would violate his constitutional right to be free of excessive force. *Anderson v. Creighton*, 483 U.S. 635 (1987). Catlett asks that we reverse the District Court's determination that he was not so entitled on the current record. As a threshold matter, we must

4

determine whether we have jurisdiction to review the District Court's determination and, if so, the scope of that jurisdiction.

## A. *Jurisdiction*

We have jurisdiction to review final orders of district courts under 28 U.S.C. § 1291. Under the collateral order doctrine, an order is final for purposes of § 1291, even if it does not terminate proceedings in the district court, so long as it conclusively determines the disputed question, resolves an important issue completely separate from the merits of the action, and would be effectively unreviewable on appeal from a final judgment. *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). Because qualified immunity is an immunity from having to litigate, as contrasted with an immunity from liability, "it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). As a result, a district court's order denying a motion for summary judgment based on qualified immunity is effectively unreviewable on appeal from a final judgment and, assuming the other two requirements are met, is appealable as a final order under the collateral order doctrine. *Id.*

Our jurisdiction to review orders denying a summary judgment motion based on qualified immunity is limited, however, to the review of legal issues. *Johnson v. Jones*, 515 U.S. 304 (1995). Accordingly, "we possess jurisdiction to consider an appeal from a decision of a district court rejecting a government official's claim of entitlement to qualified immunity to the extent that the official maintains that the official's conduct did not violate clearly established law." *Winfield v. Bass*, 106 F.3d 525, 529 (4th Cir. 1997). On the other hand, "to the extent that the appealing official seeks to argue the insufficiency of the evidence to raise a genuine issue of material fact —for example, that the evidence presented was insufficient to support a conclusion that the official engaged in the particular conduct alleged —we do not possess jurisdiction under § 1291 to consider the claim." *Id.* at 529-30. In *Bass* we summarized and restated the principles articulated by the Supreme Court in *Johnson* as follows:

> In other words we possess no jurisdiction over a claim that a plaintiff has not presented enough evidence to prove that the plaintiff's version of the events actually occurred, but we

have jurisdiction over a claim that there was no violation of clearly established law accepting the facts as the district court viewed them.

*Id.* at 530.

Where, as here, the District Court articulates the facts as it viewed them in determining that summary judgment was inappropriate, the task of an appellate court is relatively straightforward. It must accept those facts and then determine whether, based on those facts, a reasonable person in the defendant's position could have believed that he or she was acting in conformity with the clearly established law at the time. To the extent the appellant argues that the record evidence, viewed in the light most favorable to the appellee, is insufficient to support the facts as articulated by the District Court, the reviewing court lacks jurisdiction to entertain the appeal. *Id.* at 529-30.

These principles dictate that we decline to entertain most of Catlett's arguments with respect to the excessive force claim. The District Court's opinion concludes that there is evidence in the record from which a trier of fact could conclude, *inter alia*, that Hopkins did not resist police commands or struggle outside of the car with White for his gun and that he was standing still with his hands raised over his head when he was shot. We cannot consider Catlett's arguments that the record will not support those findings.

Appellants, for example, point to the testimony of Dr. Fowler and Agent Smrz and challenge the District Court's finding that there is a genuine issue of material fact regarding whether Gary Hopkins grabbed for White's gun once he was out of the car. The District Court concluded, however, that the fact that Hopkins' DNA was found on the front sight of White's handgun is not dispositive of the question of whether Hopkins resisted after exiting the vehicle, given the testimony that he lunged for the gun twice, once before getting completely out of the car. Appellants are not here arguing a point of law. Rather, they are arguing "the insufficiency of the evidence to raise a genuine issue of material fact." *Winfield*, 106 F.3d at 529. We lack jurisdiction to consider this argument.

6

B. *Qualified Immunity*

In order to determine whether the District Court erred in rejecting Catlett's claim to qualified immunity, we must first ask whether a violation of a right secured by the Fourth Amendment occurred; we must then inquire whether that right was so clearly established at the time of the violation that a reasonable officer in Catlett's position could not have believed he was acting legally. *Rogers v. Pendleton*, 249 F.3d 279, 286 (4th Cir. 2001). Once we accept the facts that the District Court determined to be supported by the record, these issues are not difficult.

The following Fourth Amendment law was clearly established at the time of the events giving rise to this suit. Whether the State used excessive force is determined under the Fourth Amendment's "objective reasonableness standard."[1] *Graham v. Connor*, 490 U.S. 386, 388, 394 (1989). Applying this standard "requires a careful balancing of `the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing government interests at stake." *Id.* at 396 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). The analysis of an excessive force claim further "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Moreover, because police officers are often forced to make split-second judgments — in circumstances that are

---

[1] In addition to asserting that Catlett violated Hopkins' Fourth Amendment right, Gray-Hopkins contends that he also violated Hopkins' Fourteenth Amendment substantive due process rights. In *Graham*, the Supreme Court held that "a free citizen's arrest, investigatory stop, or other `seizure' of his person, . . . are properly analyzed under the Fourth Amendment's `objective reasonableness' standard, rather than under a substantive due process standard." 490 U.S. at 388. The Court held that such a claim "is most properly characterized as one invoking the protections of the Fourth Amendment" and that the validity of an excessive force claim "must then be judged by reference to th[is] specific constitutional standard which governs that right." *Id.* at 394. Thus, we need not address Gray-Hopkins' claim regarding the alleged violation of Gary Hopkins' substantive due process rights.

tense, uncertain, and rapidly evolving, the facts must be evaluated from the perspective of a reasonable officer on the scene, and the use of hindsight must be avoided. *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). Deadly force, however, "is . . . justified only where a reasonable officer would have `sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others.'" *Clem*, 284 F.3d at 550 (citing *Elliot v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996)).

Based on the plaintiff's version of the events giving rise to this case, which the District Court found to be supported by competent evidence, Hopkins was standing still with his hands raised over his head at the time of the fatal shot, he was not resisting arrest, and he was not posing a threat to the safety of the officers or others. Based on these facts, a trier of fact could clearly conclude that a Fourth Amendment violation occurred and that a reasonable officer in Catlett's position could not have believed he was acting lawfully.

### III. *THE STATE LAW CLAIMS*

The complaint alleges (1) a violation of Articles 24 and 26 of the Maryland Declaration of Rights, (2) wrongful death and survivorship claims, (3) an assault and battery claim, and (4) a general negligence claim. Each claim is based on essentially the same factual allegations as the federal claim. In response to each of these claims, Catlett asserted a public official immunity defense and the County asserted a governmental immunity defense. The District Court held that each was entitled to immunity with respect to the negligence claims but not entitled to immunity with respect to the constitutional and intentional tort claims. Catlett and the County asked us to review the District Court's refusal to grant them summary judgment on the constitutional and intentional tort claims.

### A. *Appellate Jurisdiction*

In determining whether appellate jurisdiction exists"`the parties . . . in a federal action such as this one involving pendent state claims, are bound by federal procedural rules governing appeals, including the collateral order doctrine.'" *In re City of Philadelphia Litigation*, 49 F.3d 945, 957 (3d Cir. 1995) (citing *Brown v. Grabowski*, 922 F.2d 1097, 1106 (3d Cir. 1990)); *see also Sorey v. Kellett*, 849 F.2d 960,

962 (5th Cir. 1988); *Marrical v. Detroit News, Inc.*, 805 F.2d 169, 172 (6th Cir. 1986). We must look to substantive state law, however, in determining the nature and scope of a claimed immunity. *In re City of Philadelphia Litigation*, 49 F.3d at 957.

Appellants' brief asserts that they are entitled to summary judgment on the merits of the assault and battery claims and that the complaint "fails to state a claim [for] wrongful death and survival." The collateral order doctrine does not provide us with appellate jurisdiction over contentions, like these, that are unrelated to immunity issues, and we know of no other basis for such jurisdiction. *See O'Bar v. Pinion*, 953 F.2d 74 (4th Cir. 1991).

To the extent these appeals challenge the District Court's refusal to honor claims of public official and governmental immunity, we must apply the collateral order doctrine with due regard to the nature and scope of the immunity. We have appellate jurisdiction if, under state law, the immunity is an immunity from suit, but we lack such jurisdiction if it is an immunity from liability only. Where immunity from liability is involved, any error of the district court is effectively reviewable in an appeal from the final judgment. As the Third Circuit Court of Appeals explained in *Brown v. Grabowski*, 922 F.2d 1097, 1106-7 (3d Cir. 1990):

> A *Mitchell* analysis coupled with the teachings of *Erie Railroad v. Tomkins*, 304 U.S. 64 (1938) dictates that the right to an interlocutory appeal from the denial of a claim of absolute or qualified immunity under state law can only exist where the state has extended an underlying substantive right to be free from the burdens of litigation arising from acts taken in the course of official duties.

*See also Sheth v. Webster*, 145 F.3d 1231, 1236 (11th Cir. 1998).

### 1. *Governmental immunity*

Governmental immunity, which is enjoyed by counties and municipalities under Maryland law, is a more limited form of the sovereign immunity enjoyed by the State. *Austin v. City of Baltimore*, 405 A.2d

9

255, 256-57 (Md. 1979). Counties are afforded governmental immunity only when they perform governmental, as opposed to propriety functions. While that immunity is, accordingly, "much narrower than the immunity of the State, [it is] nevertheless . . . derived from the State's sovereign immunity." *Board of Educ. of Prince George's County v. Town of Riverdale*, 578 A.2d 207, 210 (Md. 1990).

The sovereign immunity of the State of Maryland is an immunity from suit. Since this is its source, governmental immunity is of the same nature. *See Maryland v. Hogg*, 535 A.2d 923, 927 (Md. 1988) ("[T]he State's sovereign immunity not only protects the public treasury but also protects the State and its instrumentalities from standing trial."); *City of District Heights v. Denny*, 719 A.2d 998, 1004 (Md. Ct. App. 1998) ("[W]here the effect of the denial of a motion for summary judgment is to reject a defendant's claim of governmental immunity, an appeal `does apparently lie under the collateral order doctrine.' ").

### 2. *Public official immunity*

The nature and scope of the public official immunity enjoyed by municipal and county officials acting in a discretionary capacity in Maryland is less clear. On two occasions the Maryland Court of Special Appeals has permitted appeals under the collateral order doctrine from denials of summary judgment with respect to claims of common law public official immunity, thus implying that this immunity is an immunity from suit. *Baltimore Police Dept. v. Cherkes*, 780 A.2d 410 (Md. Ct. App. 2001); *Port Deposit v. Petetit*, 688 A.2d 54 (Md. Ct. App. 1997).[2] The Maryland Court of Appeals has yet to provide guidance on the issue, however. In the absence of such guidance, we pre-

---

[2] "In Maryland, public official immunity is recognized both at common law and by statute." *City of District Heights v. Donny*, 719 A.2d 998, 1002 (Md. Ct. App. 1998). Appellants take the position that the common law of public official immunity "has been codified within § 5-507(b)(1) of the Md. Code Ann. Cts. & Jud. Process" and thus do not suggest that there is a material difference between the two. Appellants Opening Br. p. 25 n.2. *See Ashton v. Brown*, 660 A.2d 447, 470 n. 23 (Md. 1995) (reviewing legislative history suggesting that § 5-507(b)(1) was intended to codify the common law).

dict that the Maryland Court of Appeals, if required to determine this issue, would look to the common law of official immunity and reach the same conclusion that the Supreme Court of the United States has reached based on that common law in fashioning the federal doctrine of qualified immunity from civil rights liability.

In *Pierson v. Ray*, 386 U.S. 547 (1967), the Supreme Court held that "the defense of good faith and probable cause . . . available to [police] officers in the common law action for false arrest and imprisonment is also available to them in the action under § 1983." There followed a series of decisions in which the Supreme Court fashioned the law of qualified immunity by looking to the common law. *See, e.g.*, *Harlow v. Fitzgerald*, 457 U.S. 800, 806-08 (1982); *Owen v. City of Independence*, 445 U.S. 622, 638 (1980). Each of its "decisions on § 1983 immunities . . . [has been] predicated upon a considered inquiry into the immunity historically accorded by the relevant common law and the interests behind it." *Imbler v. Pachtman*, 424 U.S. 409, 421 (1976). When presented directly with the issue of whether qualified immunity is an immunity from suit in *Mitchell v. Forsyth*, 472 U.S. 511, 525-26 (1985), the Supreme Court looked to the interests traditionally viewed as supporting common law immunity for public officials:

> The conception animating the qualified immunity doctrine as set forth in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), is that "where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken`with independence and without fear of consequences.'" *Id.*, at 819, quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967). As the citation to *Pierson v. Ray* makes clear, the "consequences" with which we were concerned in *Harlow* are not limited to liability for money damages; they also include "the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Harlow*, 457 U.S. at 816. Indeed, *Harlow* emphasizes that even such pretrial matters as discovery are to be avoided if possible, as "[i]nquiries of

11

this kind can be peculiarly disruptive of effective government." *Id*. at 817.

We predict that the Maryland Court of Appeals would find that the common law of official immunity was founded in part on the same concerns and would reach a similar conclusion. On that basis, we hold that we have jurisdiction to review the District Court's refusal to honor Catlett's claims of public official immunity.

### B. *Public Official Immunity*

The District Court held that Catlett was not entitled to public official immunity with respect to the state law constitutional and intentional tort claims because the "[p]laintiff's version of the facts, if accepted, would justify a conclusion that . . . Catlett shot and killed Mr. Hopkins with malice and without justification." App. 341. We agree. Neither statutory nor common law immunity is available to a Maryland public official who acts with malice. *DiPino v. Davis*, 729 A.2d 354, 370 (Md. 1999) (common law public official immunity is not available "if the officer . . . acts with malice"); Md. Code Ann. Cts. & Jud. Proc. § 5-507(b)(1) (official of a municipal corporation is entitled to immunity only "while acting in a discretionary capacity, without malice, and within the scope of [his] employment.").[3]

### C. *Governmental Immunity*

We also agree with the District Court's determination that the County is not entitled to governmental immunity with respect to the constitutional claims. *DiPino*, 729 A.2d at 371; *Clea v. City of Baltimore*, 541 A.2d 1303, 1305 (Md. 1988). We conclude, however, that

---

[3] Appellee insists that public official immunity is never available in Maryland with respect to a constitutional or intentional tort. Given our conclusion with respect to malice, we have no occasion to reach these issues. *See* Md. Code Ann. Cts. & Jud. Proc. § 5-507(b)(1) (conferring immunity on officials of municipal corporations without an express exclusion of constitutional or intentional torts) and *Thomas v. City of Annapolis*, 688 A.2d 448, 457 (Md. Ct. App. 1997) (noting that the Court of Appeals has not decided whether § 5-507(b)(1) "codifies common law immunity or whether it applies to intentional and constitutional torts").

the County enjoys governmental immunity with respect to the claims that seek to impose *respondeat superior* liability for an intentional tort committed by Catlett. Under Maryland law, a county "is immune from liability for tortious conduct committed while the entity was acting in a governmental capacity." *DiPino*, 729 A.2d at 370. Assuming that Catlett was acting within the scope of his employment so as to render *respondeat superior* applicable, he clearly was performing a governmental function. *Id.* (holding that law enforcement is a governmental function).

The fact that Catlett is not entitled to public official immunity with respect to intentional torts does not mean that the County is without governmental immunity with respect to such torts. In *DiPino*, a municipal police officer was sued for false imprisonment, malicious prosecution and abuse of process, all intentional torts. The plaintiff also sought to impose *respondeat superior* liability on the municipality for those torts. The Maryland Court of Appeals held that while the officer was not entitled to public official immunity, the municipality was entitled to governmental immunity because the officer was alleged to be performing a governmental function. *Id.* at 370.

## IV. *CONCLUSION*

With one exception, we agree with the District Court's disposition of all of the issues we have jurisdiction to review. We must reverse the order appealed from, however, to the extent it denied the County's motion for summary judgment on the plaintiff's intentional tort claims. We will remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

13