**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

MICHAEL BAILEY; JANE BAILEY; BILLY
BAILEY,
                    *Plaintiffs-Appellees,*

                    v.                                            No. 02-1761

D. H. KENNEDY; D. B. WHITLEY;
MIKE CRISP; CITY OF HICKORY,
                    *Defendants-Appellants.*

MICHAEL BAILEY; JANE BAILEY; BILLY
BAILEY,
                    *Plaintiffs-Appellants,*

                    v.                                            No. 02-1818

D. H. KENNEDY; D. B. WHITLEY;
MIKE CRISP; CITY OF HICKORY,
                    *Defendants-Appellees.*

Appeals from the United States District Court
for the Western District of North Carolina, at Statesville.
Carl Horn, III, Magistrate Judge.
(CA-00-8-5-H)

Argued: September 23, 2003

Decided: November 17, 2003

Before WILLIAMS and TRAXLER, Circuit Judges, and
HAMILTON, Senior Circuit Judge

Affirmed and remanded for further proceedings by published opinion. Judge Williams wrote the opinion, in which Judge Traxler and Senior Judge Hamilton joined.

---

## COUNSEL

**ARGUED:** Robert Danny Mason, Jr., WOMBLE, CARLYLE, SAN-DRIDGE & RICE, P.L.L.C., Winston-Salem, North Carolina, for Appellants. Stephen Luke Largess, FERGUSON, STEIN, CHAM-BERS, WALLAS, ADKINS, GRESHAM & SUMTER, P.A., Char-lotte, North Carolina, for Appellees. **ON BRIEF:** James R. Morgan, Jr., WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Winston-Salem, North Carolina, for Appellants.

---

## OPINION

WILLIAMS, Circuit Judge:

Officers D.H. Kennedy, D.B. Whitley, Mike Crisp, and the City of Hickory appeal the district court's denial of qualified immunity and public officers' immunity on several of Michael, Jane, and Billy Bai-ley's federal constitutional and state law claims. The Baileys' claims arose in connection with two separate incidents: the seizure of Michael Bailey[1] on May 27, 1998, inside the home of his parents, Jane and Billy Bailey; and the arrest of Michael Bailey on September 3, 1998. As discussed below, accepting the facts as the district court[2] viewed them in denying qualified immunity, the police officers vio-lated clearly established federal law. In addition, under North Caro-lina law, an officer of reasonable intelligence would have known that the police officers' actions were contrary to their duty. Accordingly,

---

[1]The record indicates that Michael was 41 years-old at the time these events took place.

[2]The parties consented to have the case decided by a Magistrate Judge pursuant to 28 U.S.C.A. § 636(c) (West Supp. 2003). For ease of refer-ence, we refer to the magistrate judge as the district court throughout.

we affirm the district court's denial of qualified immunity and public officers' immunity.

The Baileys cross-appeal the district court's grant of summary judgment to the police officers and the City of Hickory on the Baileys' procedural due process claim, and its denial of summary judgment on two of their state law claims. Because we do not have jurisdiction over this interlocutory cross-appeal, *see Swint v. Chambers County Comm.*, 514 U.S. 35 (1995), we grant the motion to dismiss the cross-appeal.

## I.

On May 27, 1998, Officers Whitley and Kennedy, police officers with the City of Hickory, North Carolina, took Michael Bailey involuntarily out of his parents' home to a hospital for an emergency mental evaluation. Accepting the facts as the district court viewed them, Michael was riding his bike while intoxicated before the officers were called.[3] He rode to his neighbor's house and fell down. His neighbor, Ms. Matheson, called 911. The 911 operator "relayed the following report to a City police communications operator: 'Mike Bailey advised a neighbor that he is going home to commit suicide. He is intoxicated and has been depressed.'" (J.A. at 75.) Officers Whitley and Kennedy responded separately to the call. Officer Whitley arrived at the Baileys' home first. The district court described the subsequent events as follows:

> It is undisputed that Michael was home alone when Defendant Whitley arrived and knocked on the front door of the house. In the light most favorable to the Plaintiffs,

---

[3]We recognize that the police officers hotly dispute what happened on the afternoon of May 27. As discussed below, our jurisdiction to consider an appeal from the denial of qualified immunity is limited. We must accept the facts as the district court viewed them and "determine whether, based on those facts, a reasonable person in the defendant's position could have believed that he or she was acting in conformity with the clearly established law at the time." *Gray-Hopkins v. Prince George's County, Md.*, 309 F.3d 224, 229 (4th Cir. 2002). Accordingly, we quote at length from the district court's recitation of the facts.

Michael admitted Defendant Whitley into the house and returned to sit at the dining table where he was eating lunch. Defendant Whitley asked Michael a series of questions, which Michael answered to Defendant Whitley's apparent satisfaction. Michael denied any thoughts of suicide, but declined Defendant Whitley's request to search the rest of the house, instead directing Defendant Whitley to contact his father, Plaintiff Billy Bailey, for permission to conduct a search.

It is undisputed that there were no weapons or any other evident preparations for a suicide attempt in view in the foyer, dining room, or kitchen of the house, but Michael testified in his deposition that he told Defendant Whitley that his father kept guns locked in a gun safe.[3] In the light most favorable to the Plaintiffs, Michael asked Defendant Whitley to leave, escorted him out of the house, and closed the front door. . . .

--------

FN.3 Michael Bailey's deposition testimony that he told Defendant Whitley about the gun safe is the first mention in the record of even the possibility of a gun being in the Bailey residence. In his deposition, Defendant Whitley could not recall ever asking Michael about the presence of weapons in the house, but merely asked generally for permission to search.

--------

There is no evidence . . . that Defendant Whitley voiced any objection to returning to the porch or made any attempt to remain inside the house or prevent Michael from closing the door. Instead, Defendant Whitley stepped out of the house and allowed Michael to shut the door.

At the same time that Defendant Whitley stepped out the front door onto the porch, Defendant Kennedy arrived on the scene, exited his patrol car, and began to walk towards the front porch. Defendant Whitley rang the doorbell but

then stepped a few feet away from the doorway, turned his back to the door, and attempted to contact his supervisor, Lieutenant Ron Lambreth, via his portable radio.

Even in the light most favorable to the Defendants, Defendant Whitley said only "we're going to have to do something" to Defendant Kennedy, before Defendant Whitley began his radio conversation with his supervisor and Defendant Kennedy knocked on the front door. . . .

It is undisputed that while [Michael] was . . . speaking with his sister-in-law on the telephone — that is, while he was holding the telephone handset to his ear — Michael reopened the front door and faced Defendant Kennedy.

In the light most favorable to the Plaintiffs, after telling Defendant Kennedy that the suicide report was "crazy," that the officers "need[ed] to leave," and that he was going to call his lawyer, Michael attempted to close the door and turned and reached towards a cabinet where the telephone base was located. In the light most favorable to the Plaintiffs, Defendant Kennedy placed his foot in the doorway to prevent the door from closing and grabbed Michael's arm in an attempt to pull him onto the porch. Defendant Kennedy then stepped into the house and began to fight with Michael in an attempt to take him to the floor.

. . .

. . . [W]hen Defendant Whitley heard sounds of a struggle and Defendant Kennedy's verbal commands for Michael to get down on the floor, he turned and saw Defendant Kennedy fighting with Michael. Defendant Whitley discontinued his radio call and ran to assist Defendant Kennedy.

. . . Michael testified that Defendant Kennedy had tackled him and knocked him off his feet before Defendant Whitley came into the house, while Defendant Whitley testified that it required the efforts of both officers to finally take Michael to the floor.

It is undisputed that the officers ultimately succeeded in holding Michael down on the floor and placed a handcuff on one of his wrists. Defendant Whitley testified that Defendant Kennedy then struck Michael in the face "multiple" times with his fist, cutting Michael's mouth and lips, which bled and required stitches. Defendant Kennedy testified that he struck Michael "two or three times" in order to subdue Michael to the point that he could be handcuffed with his hands behind his back. Michael testified that his left shoulder was also injured by the Defendant officers' repeated attempts to grab his arm and apply handcuffs.

The Defendant officers finally handcuffed Michael with his hands in front, held him down on the floor, and waited for back-up. At 2:28 p.m., the Defendant officers did a "stop unit time check" on their portable radios, indicating that they were not in any danger.

Three minutes later, other officers arrived and placed flex-cuffs on Michael's ankles and wrists — this time with his hands behind his back. . . .

Michael testified . . . that while he was still lying face-down in the house, with his hands and feet "flex-cuffed," that Defendant Kennedy attempted to pick him up by the arms, which caused great pain in his shoulders. Michael testified that Defendant Whitley responded to his curses and shouts of pain by kicking him in the back.

In the light most favorable to the Plaintiffs, one unknown officer then dragged Michael by his feet to the curbside.

At this point, Plaintiff Billy Bailey arrived at his home. He observed his son still resisting the officers' attempts to place him in a police car and saw that Michael had scratches on his back and was bleeding profusely from his mouth. Mr. Bailey told Michael to stop fighting. . . .

. . . After the officers left with Michael, Mr. Bailey went inside the house where he discovered on the foyer floor a pool of blood that was two feet in diameter.

(J.A. at 76-80.) We note that, in the light most favorable to the Baileys, after the officers arrived at the hospital, they falsely told the doctors that Michael had attacked them and that Michael's father already had petitioned to have Michael involuntarily committed. Kennedy then proceeded to procure a commitment order from the county magistrate without disclosing that Michael was already in custody. In addition, Kennedy completed the return of service portion of the commitment order by falsely indicating that he had served the order on Michael.

The second incident alleged in the complaint involved Michael Bailey's arrest on September 3, 1998. On the morning of September 3, Michael Bailey consumed an unknown quantity of alcohol. He then walked from his home to a Wachovia bank branch and attempted to cash a check. The teller refused to cash the check because Michael did not have any identification and was not a customer of the bank. Michael "'exchanged words' with bank personnel, including a 'cuss word.'" (J.A. at 83.) The bank employees called the police. Sergeant Sigmon and Officer Kennedy responded to the bank. After talking with bank employees, who described a man wearing a green tank top and black pants, Sergeant Sigmon left the bank and drove in the direction that the bank employees had last seen the man with the green tank top walking. Officer Kennedy then returned to the scene of an unrelated accident.

Sergeant Sigmon soon came upon Michael, who met the description of the man who had been in the bank. She asked him where he was going. "Michael replied that he was going home and asked if the teller was going to press charges against him. Michael testified that Sergeant Sigmon responded by saying, 'No,' but asked Michael to go home and return with someone who would confirm that he would not go back to the bank." (J.A. at 84.)

Michael left Sergeant Sigmon and then returned with his neighbor Ms. Miller. By the time Michael returned, Officer Kennedy had arrived. "Kennedy informed Michael that he intended to arrest him for the events that occurred at the bank; Michael responded that he had resolved the matter with Sergeant Sigmon and that Defendant Kennedy did not need to become involved. In the light most favorable to the Plaintiffs — that is, according to Ms. Miller's affidavit —

Michael neither threatened nor cursed Defendant Kennedy but only asked Defendant Kennedy to stop harassing him." (J.A. at 84-85.)

Kennedy then struck Michael in the chin and pushed him back 20 to 30 feet over a bush. Sigmon and Kennedy then sprayed Michael with pepper spray. "[Michael] did not fight with the officers or resist arrest in any way, and it is undisputed that he was handcuffed and placed in the back of Defendant Kennedy's patrol car."[4] (J.A. at 85.)

## II.

On January 12, 2000, Michael Bailey, Jane Bailey and Billy Bailey filed a complaint against D.H. Kennedy, D.B. Whitley, Mike Crisp, (the police officers) and the City of Hickory, alleging violations of the United States Constitution, actionable under 42 U.S.C.A. § 1983 (West 2003), as well as violations of the North Carolina Constitution and North Carolina common tort law. Specifically, Michael Bailey alleged that on May 27, 1998, Kennedy and Whitley violated his right to be free from unreasonable seizure under the Fourth Amendment by seizing him in the absence of probable cause and by using excessive force; violated his right to procedural due process under the Fourteenth Amendment;[5] and committed the state common law torts of trespass by a public official, false arrest, false imprisonment, assault and battery, and gross negligence. Jane and Billy Bailey alleged that on May 27, 1998, Kennedy and Whitley violated their Fourth Amendment right to be free from unreasonable search; violated their analogous right under the North Carolina Constitution; and committed the state common law tort of trespass by a public official. In addition, Michael Bailey alleged that on September 3, 1998, Kennedy and Crisp violated his Fourth Amendment right to be free from unreason-

---

[4]The complaint and the district court's opinion include additional facts about the incidents after Michael was placed in the patrol car and taken to the police station, including the participation of Officer Crisp. Because the police officers do not appeal the district court's denial of qualified immunity on the excessive force claim and denial of public officers' immunity on the state law assault and battery claim related to these subsequent events, we do not discuss them further.

[5]Michael Bailey also alleged a violation of his substantive due process rights, but he later voluntarily dismissed that claim.

able seizure and committed the state common law torts of trespass by a public official, false arrest, assault and battery, and malicious prosecution. The Baileys sued the City of Hickory on a theory of respondeat superior based on the police officers' actions on both May 27 and September 3.

On January 31, 2000, the police officers and the City moved for summary judgment on all claims, and the Baileys filed a cross-motion for partial summary judgment on all claims arising out of the May 27 event. The police officers based their motion for summary judgment, as it related to the federal constitutional claims, on the defense of qualified immunity, and as it related to the state law claims, on state law public officers' immunity.

On April 16, 2002, the district court entered summary judgment in favor of the City on the federal constitutional claims against it, entered summary judgment in favor of Kennedy and Whitley on the procedural due process claim against them, granted qualified immunity to the police officers on the Fourth Amendment false arrest claim associated with the September 3 incident, and entered summary judgment in favor of the police officers on the malicious prosecution claim associated with the September 3 incident. The district court denied the parties' motions for summary judgment respecting the remaining claims.

The police officers now appeal the denial of qualified immunity on the federal constitutional claims associated with the May 27 event; the denial of public officers' immunity on the state law claims associated with the May 27 event; and the denial of public officers' immunity on the state law false arrest claim associated with the September 3 event.

The Baileys filed a timely notice of cross-appeal. In their brief, the Baileys limit their cross-appeal to three issues: the grant of summary judgment to the police officers and the City of Hickory on the procedural due process claim; the denial of summary judgment on the state law claim of false imprisonment associated with the May 27 incident; and the grant of summary judgment to the police officers and the City of Hickory on the state law malicious prosecution claim associated with the September 3 incident. As noted above, we do not have juris-

diction over this interlocutory cross-appeal. *Swint v. Chambers County Comm.*, 514 U.S. 35 (1995).

III.

We have jurisdiction to review final orders of district courts under 28 U.S.C.A. § 1291 (West 1993). The police officers appeal the district court's denial of qualified immunity on the federal law claims. To the extent that an order of a district court rejecting a government official's qualified immunity defense turns on a question of law, it is a final decision within the meaning of § 1291 under the collateral order doctrine recgonized in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949), and is therefore subject to immediate appeal. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995) (holding that although interlocutory appeal is allowed from the denial of qualified immunity, questions of evidentiary sufficiency are not collaterally appealable). Accordingly, "we possess jurisdiction to consider an appeal from a decision of a district court rejecting a government official's claim of entitlement to qualified immunity to the extent that the official maintains that the official's conduct did not violate clearly established law." *Winfield v. Bass*, 106 F.3d 525, 529 (4th Cir. 1997) (en banc). On the other hand, "to the extent that the appealing official seeks to argue the insufficiency of the evidence to raise a genuine issue of material fact—for example, that the evidence presented was insufficient to support a conclusion that the official engaged in the particular conduct alleged—we do not possess jurisdiction under § 1291 to consider the claim." *Id.* at 529-30.

Where, as here, the district court articulates the facts as it viewed them in determining that summary judgment was inappropriate, our task is relatively straightforward. We "must accept those facts and then determine whether, based on those facts, a reasonable person in the defendant's position could have believed that he or she was acting in conformity with the clearly established law at the time." *Gray-Hopkins v. Prince George's County, Md.*, 309 F.3d 224, 229 (4th Cir. 2002); *accord Bass*, 106 F.3d at 530 (holding that in reviewing the denial of qualified immunity we "accept[ ] the facts as the district court viewed them").

The police officers also appeal the denial of public officers' immunity on the state law claims. In determining whether we have jurisdic-

tion over the questions of law in this interlocutory appeal, "we must apply the collateral order doctrine with due regard to the nature and scope of the immunity." *Gray-Hopkins*, 309 F.3d at 231. We have jurisdiction over the denial of public officers' immunity if "under state law, the immunity is an immunity from suit, but we lack such jurisdiction if it is an immunity from liability only." *Id.* Because, under North Carolina law, public officers' immunity is an immunity from suit, *Summey v. Barker*, 544 S.E.2d 262, 264 (N.C. App. 2001), we have jurisdiction over the police officers' appeal of the district court's denial of public officers' immunity to the state law claims. We again accept the facts as the district court viewed them.

"We review de novo the district court's denial of qualified immunity, employing our full knowledge of our own and other relevant precedents." *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003). "The burden of proof and persuasion with respect to a claim of qualified immunity is on the defendant official." *Id.* We also review the denial of public officers' immunity de novo. *See Gray-Hopkins*, 309 F.3d at 233-34 (reviewing denial of public official immunity de novo).

## IV.

Determining whether a state officer is entitled to qualified immunity is a two-step inquiry. First, we must decide "whether a constitutional right would have been violated on the facts alleged." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). "Next, assuming that the violation of the right is established, courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002).

## A.

Considering first Michael Bailey's Fourth Amendment unlawful seizure claim, our initial task is to assess whether the facts alleged, taken in the light most favorable to Michael Bailey, indicate that Officers Kennedy and Whitley had probable cause to seize Michael for an emergency mental evaluation. *See S.P. v. City of Takoma Park*, 134 F.3d 260, 266 (4th Cir. 1998) (holding that police officers "must have probable cause to believe that the individual posed a danger to

[him]self or others before involuntarily detaining the individual"). If probable cause was lacking, then Michael has successfully asserted the violation of a constitutional right — specifically his Fourth Amendment right against unreasonable seizure — and we may move on to the second prong of our qualified immunity analysis.

Probable cause is a "practical, nontechnical conception" that addresses the "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 231 (1993) (quotation marks omitted). It is a "fluid concept" that cannot be "reduced to a neat set of legal rules." *Id.* at 232. We have previously held that in the case of the law governing seizures for psychological evaluations, there is a "lack of clarity" as far as what constitutes probable cause. *Gooden v. Howard County*, 954 F.2d 960, 968 (4th Cir. 1992). Based on Michael's version of the events giving rise to this case, as accepted by the district court, when Officer Whitley responded to the 911 dispatch, he found Michael intoxicated and sitting at the dining room table eating lunch. Michael denied any thoughts of suicide, and there were no weapons or any other preparations for a suicide attempt evident. When Officer Whitley asked for permission to search the house, Michael told the officer to contact Michael's father, Billy Bailey, the owner of the house, for permission to search. Apparently satisfied, Officer Whitley left the house within five minutes of his arrival. Officer Kennedy arrived as Officer Whitley was leaving the house. Officer Whitley said, at most, "we're going to have to do something." (J.A. at 77.) Michael, who was then on the telephone, opened the door when Officer Kennedy knocked, and again denied any thoughts of suicide, calling the suicide report "crazy." (J.A. at 77.) He told the officers that they needed to leave and that he was going to call his lawyer. Michael attempted to close the door and turned toward a cabinet where the telephone base was located. At this point, Officer Kennedy placed his foot in the doorway to prevent the door from closing and grabbed Michael's arm.

The police officers argue that they had probable cause to seize Michael for an emergency mental evaluation based on the neighbor's 911 report. According to the officers, the 911 report asserted that Michael was at home, intoxicated, and suicidal. The police officers argue that once they confirmed two of these three assertions, namely

that Michael was at home and intoxicated, they then had probable cause to believe that Michael was a danger to himself. Michael, however, denied any thoughts of suicide, calling the report crazy. When Officer Whitley arrived, Michael was sitting at the dining room table eating lunch. More telling, after talking to Michael for approximately five minutes, Officer Whitley exited the house. Officer Kennedy, knowing only that Officer Whitley had exited the house and that Officer Whitley said "we're going to have to do something," grabbed Michael almost as soon as he opened the door.

Without more, the 911 report cannot bear the weight that the officers would place on it. The law does not permit "random or baseless detention of citizens for psychological evaluations." *Gooden*, 954 F.2d at 968. The facts of this case are distinguishable from *Gooden*, where the police officers responded on two separate dates to citizen reports of screaming in an apartment building. On the second visit, the police officers heard the screaming themselves and believed that Ms. Gooden's apartment was the source of the scream. When questioned, Ms. Gooden admitted that she had "yelped," ostensibly due to burning herself on a hot iron. *Id.* at 962. After leaving Ms. Gooden's apartment, the police officers again heard noises coming from the apartment, including loud thuds and screaming. After again talking to Ms. Gooden, searching her apartment, and conferring with each other, the officers decided to detain Ms. Gooden for an emergency mental evaluation. *Id.* at 963-64.

This case is also distinguishable from *S.P. v. City of Takoma Park*. In *S.P.*, the police responded to a husband's report that his wife was possibly suicidal. When the officers arrived at S.P.'s home, they found her alone, "obviously distraught and crying." *S.P.*, 134 F.3d at 267. She "admitted that she had had a 'painful' argument with her husband and that if not for her children, she would have considered committing suicide." *Id.* After observing and interviewing S.P., the police officers made "a deliberate decision" to detain her for an emergency mental evaluation. *Id.*; *see also In re Woodie*, 448 S.E.2d 142 (N.C. App. 1994) (holding that involuntary commitment was proper where person had attempted suicide, and when doctor advised him that he needed to be hospitalized, he abruptly walked out of the doctor's office and said he was going to kill himself).

In this case, the police officers had no evidence to support the assertion in the 911 report that Michael was suicidal. Michael was not visibly distraught or crying. Instead, he was eating lunch. There were no weapons or other suicide preparations evident, and Michael denied the suicide reports, told the officers they needed to leave, and said he was going to call his lawyer. Moreover, after talking with Michael for approximately five minutes, Whitley voluntarily left the house. Of course, citizen complaints are entitled to some credence, and officers need not wait "until they [see] blood, bruises and splintered furniture." *Gooden*, 954 F.2d at 967 (citation and quotation marks omitted). Nonetheless, accepting the facts as the district court viewed them, the 911 report, viewed together with the events after the police officers arrived, was insufficient to establish probable cause to detain Michael for an emergency mental evaluation.

We now must determine whether the right alleged to have been violated was a "clearly established . . . right[ ] of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is "clearly established" if "'the contours of the right [are] sufficiently clear'" so that a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right. *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (quoting *Anderson v. Creigton*, 483 U.S. 635, 640 (1987)). The inquiry is an objective one, dependent not on the subjective beliefs of the particular officer at the scene, but instead on what an objectively reasonable officer would have understood in those circumstances. *Milstead v. Kibler*, 243 F.3d 157, 161 (4th Cir.), *cert. denied*, 534 U.S. 888 (2001).

In deciding whether the right alleged to have been violated was clearly established, we must define the right "at a high level of particularity." *Edwards v. City of Goldsboro*, 178 F.3d 231, 250-51 (4th Cir. 1999). We have recognized that "the general right to be free from seizure unless probable cause exists [is] clearly established in the mental health seizure context." *Gooden*, 954 F.2d at 968. We have also recognized that "an officer must have probable cause to believe that the individual posed a danger to [him]self or others before involuntarily detaining the individual." *S.P.*, 134 F.3d at 266. The test of whether a right is clearly established, however, cannot be applied at this level of generality. *Id.* Defining the right at issue with the requi-

site level of particularity, the appropriate question is whether, at the time of Kennedy and Whitley's actions on May 27, 1998, it was clearly established that a police officer may not detain someone for an emergency mental evaluation based only on a 911 report that the person was suicidal, where the officers were able to observe the person alleged to be suicidal and observed nothing indicating that the person might have been a danger to himself.

We conclude that it was clearly established that probable cause was lacking in such a situation. Although we have noted that what constitutes "dangerousness" in the mental health seizure context is not precisely defined, *see Gooden*, 954 F.2d at 968, this lack of clarity does not automatically immunize police officers from liability for every seizure made for purposes of a mental evaluation. As we noted above, "the law in no way permits random or baseless detention of citizens for psychological evaluations." *Id.* Accepting the facts as the district court viewed them, the police officers observed nothing that would indicate to them that Michael might be a danger to himself. Certainly, no reasonable officer, upon seeing Officer Whitley voluntarily leave the house, would have thought that Michael was in such imminent danger of harming himself that immediate seizure was required, without any additional investigation, deliberation or consultation with Whitley, who had just been inside the house. Moreover, even assuming that Whitley did say "we're going to have to do something," (J.A. at 77), to Kennedy as he arrived, there is nothing in the record to suggest that this brief, non-specific comment would have made a reasonable officer believe that immediate seizure was necessary. The contours of probable cause were sufficiently clear that the unlawfulness of seizing someone in such a situation would have been apparent to reasonable officers. Accordingly, we affirm the district court's denial of qualified immunity on Michael Bailey's Fourth Amendment unlawful seizure claim.

Several of the Baileys' other claims are intertwined with Michael's Fourth Amendment unlawful seizure claim. Because, given the facts as the district court viewed them, there was no probable cause to seize Michael for an emergency mental evaluation, the police officers also committed both false arrest and false imprisonment under state law. *See Glenn-Robinson v. Acker*, 538 S.E.2d 601, 614 (N.C. App. 2000) (holding that where police officers did not have probable cause, they

committed a false arrest); *Emory v. Pendergraph*, 571 S.E.2d 845, 848 (N.C. App. 2002) (holding that false imprisonment means the illegal restraint of someone against his will).

The police officers argue that they are entitled to public officers' immunity as to these state law claims. Under North Carolina law, public officials engaged in discretionary, governmental duties enjoy absolute immunity from personal liability so long as they keep within the scope of their official authority and act without malice or corruption. *Grad v. Kaasa*, 321 S.E.2d 888, 890 (N.C. 1984). The police officers concede, and we agree, that public officers' immunity, at the least,[6] is unavailable to officers who violate clearly established rights because an officer acts with malice when he "does that which a man of reasonable intelligence would know to be contrary to his duty."[7] *Id.* Accepting the facts as the district court viewed them, a man of reasonable intelligence would have known that seizing Michael for an emergency mental evaluation was contrary to his duty. Accordingly, the Baileys have forecast sufficient evidence of malice to foreclose the availability of public officers' immunity on the false arrest and false imprisonment claims.

Next, we consider Jane and Billy Bailey's federal and state consti-

---

[6]The Baileys argue that public officers' immunity is not available if the officer's actions exceed the scope of his authority. They argue that because an arrest without probable cause exceeds the scope of an officer's lawful authority, an officer is not entitled to public officers' immunity for any seizure made without probable cause. We need not determine whether North Carolina's public officers' immunity indeed offers such thin protection. Because we find that the acts at issue violated rights that were clearly established, an officer of reasonable intelligence would have known that the officers' actions were contrary to their duty. This is all that is required to support a finding of malice under state law, *see Grad v. Kaasa*, 321 S.E.2d 888, 890 (N.C. 1984), and it is clear that there is no public officers' immunity where the officers act with malice.

[7]A finding of malice also requires that the officer "intend[ ] [his act] to be . . . injurious to another." *Grad*, 321 S.E.2d at 890. Because the police officers argue only that a man of reasonable intelligence would not have known that their actions were contrary to their duty, we confine our discussion to the first prong of the malice definition.

tutional claims[8] based on an allegedly unlawful search of their home, as well as their state common law claim of trespass by a public officer. The police officers argue that exigent circumstances made their warrantless entry into the Bailey residence objectively reasonable. *Mincey v. Arizona*, 437 U.S. 385, 394 (1978). Because, as discussed above, the officers had no reason to believe that Michael was a danger to himself, no exigent circumstances justified their warrantless entry into the Baileys' home. Also, as discussed above, accepting the facts as the district court viewed them, it was clearly established that no exigent circumstances requiring immediate action to protect human life existed to justify the search. Moreover, a man of reasonable intelligence would not have believed that exigent circumstances existed in this situation. *See Grad*, 321 S.E.2d at 890 (holding that public officers' immunity is not warranted when official does that which a man of reasonable intelligence would know was contrary to his duty). Accordingly, we affirm the district court's denial of qualified immunity and public officers' immunity on these claims as well.

## B.

The last three claims associated with the May 27 event are the federal excessive force claim and the two related state law claims: assault and battery and gross negligence. Respecting the federal constitutional claim, as discussed above, qualified immunity is a two-step inquiry, so we turn first to whether, accepting the district court's view of the facts, there was a constitutional violation. "The Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive force to seize a free citizen." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003). We determine whether an officer has used excessive force to effect a seizure based on a standard of "'ob-

---

[8]We note that the police officers have not argued that the Baileys do not have a direct action for monetary damages for the abridgment of their state constitutional rights. Accordingly, we do not address whether the Baileys' claim of trespass by a public officer constituted an adequate remedy at law. *See Corum v. University of North Carolina*, 413 S.E.2d 276, 293 (N.C. 1992) (holding that an individual whose state constitutional rights have been abridged has a direct action for monetary damages against a state official in his official capacity, if there is no adequate remedy provided by state law).

jective reasonableness.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 399 (1989)). "We weigh the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. This test requires us to determine the reasonableness of an officer's actions and is not capable of precise definition or mechanical application. Instead it requires careful attention to the facts and circumstances of each particular case." *Id.* (quotation marks omitted). Those facts and circumstances include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The extent of the plaintiff's injury is also a relevant consideration." *Jones*, 325 F.3d at 527.

We consider the *Graham* factors in turn. Starting with the first factor, the severity of the crime at issue, Michael committed no crime. In fact, as discussed above, the police officers did not even have probable cause to seize Michael. When we considered this factor in *Jones*, we noted that "[i]n recent years, we have twice confronted situations in which a plaintiff, subjected to police force, had committed no crime; in each, we held that the plaintiff had stated a claim for violation of his constitutional right to be free from excessive police force." *Jones*, 325 F.3d at 528 (citing *Clem v. Corbeau*, 284 F.3d 543, 545-47 (4th Cir. 2002); *Park v. Shiflett*, 250 F.3d 843, 848, 853 (4th Cir. 2001)). Moreover, *Jones* itself was a case in which the plaintiff had committed no crime, and we held that because "Jones committed *no* crime, this first factor clearly weighs in his favor." *Id.* Similarly, because it was unquestionable that Michael had not committed any crime, this factor weighs heavily in Michael's favor.

The second factor, whether a reasonable officer could have perceived Michael to be an immediate threat to the safety of the officers or others, also weighs in favor of Michael. As discussed above, there was no reason to believe that Michael was a danger to himself or others, including the officers. No reasonable person viewing Officer Whitley voluntarily leaving the house could have concluded that Michael was an immediate threat to himself or to the officers. At the time that Officer Kennedy used force to seize him, Michael was attempting to shut the door to his parents' home. Moreover, it is

undisputed that Michael was unarmed. Thus, the threat to the safety of the officers or others was minimal, if it existed at all.

Turning to the third factor, it is clear that after Kennedy started to use force to seize him, Michael resisted arrest. Whitley then joined Kennedy and both administered repeated hand-blows and kicks while trying to handcuff Michael. The officers continued to use force after Michael's hands were bound behind his back,[9] his feet were bound, and he was lying face down on the floor. (J.A. at 99 ("[I]n the light most favorable to the Plaintiffs, after backup arrived and Michael's hands and feet were secured, and while he was still lying face down, Defendant Kennedy pulled him up by his arms, causing further injury to his shoulders, and Defendant Whitley kicked Michael in the back.").) Accepting the facts as the district court viewed them, Michael was not resisting arrest when he was bound hand and foot and lying face down on the floor. Accordingly, even this factor does not weigh completely against Michael.

Considering these three factors together, we conclude that the amount of force used was excessive. Assuming arguendo that some degree of force was justifiable, the extensive blows and kicks used against an unarmed man were unreasonable, especially the use of force that continued after Michael was bound hand and foot and lying face down on the floor. We note in this respect that the level of force used caused severe injuries. Michael's injuries included cuts that left a two-foot diameter pool of blood on the foyer floor and later required him to have stitches. He was also bruised and incurred shoulder injuries that required repeated surgeries to repair. (J.A. at 80, 99.)

Having determined that Michael has proffered evidence of a violation of a constitutional right, we now consider whether Officers Kennedy and Whitley are nonetheless entitled to qualified immunity. As we held in *Jones v. Buchanan*:

---

[9]Kennedy and Whitley initially handcuffed Michael with his hands in front of his body. After back-up arrived, flex-cuffs were placed on Michael's ankles and wrists — "this time with his hands behind his back." (J.A. at 79.)

> Even though the facts of a prior case may not be "identical," the reasoning of that case may establish a "premise" regarding an unreasonable use of force that can give an officer fair notice that his conduct is objectively unreasonable.
>
> Ten years before Deputy Keller's November 1999 use of force against Jones, the Supreme Court in *Graham v. Connor* had clearly established that all claims of excessive force in the course of any seizure of a free person must be analyzed under an "objective reasonableness" standard, taking into account the factors discussed above. *Graham*, 490 U.S. at 395-96, 109 S.Ct. 1865. Both before and after November 1999, courts have consistently applied the *Graham* holding and have consistently held that officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity.

*Jones*, 325 F.3d at 531-32 (citation omitted). There, we held that the officer was not entitled to qualified immunity because the officer attacked Jones "even though Jones, although drunk and using foul language, was unarmed, handcuffed, and alone in a secured room in the sheriff's headquarters." *Id.* In *Jones*, we cited several cases decided prior to May 1998, in which police officers were denied qualified immunity where the officer's use of force might seem to be more justified than the use of force in this case. *See Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994) (denying qualified immunity on excessive force claim where police officer attacked person suspected of taking a $5 bill from the floor that did not belong to him even though Rowland may have resisted after he was attacked); *Kane v. Hargis*, 987 F.2d 1005, 1006-07 (4th Cir. 1993) (denying qualified immunity on excessive force claim where taking the facts in the light most favorable to Kane, she resisted arrest for driving under the influence and the police officer, after he had secured her, "repeatedly push[ed] her face into the pavement, cracking three of her teeth, cutting her nose, and bruising her face"); *see also Mayard v. Hopwood*, 105 F.3d 1226, 1227-28 (8th Cir. 1997) (denying qualified immunity to an officer who slapped and punched a suspect, in handcuffs and leg restraints, even though the suspect had, prior to being completely restrained, kicked and hit an officer, physically resisted arrest, and shouted and

screamed at officers). "Thus, years before [1998], it was clearly established that a police officer was not entitled to use unnecessary, gratuitous, and disproportionate force against a handcuffed, secured citizen, who posed no threat to the officer or others and had neither committed, nor was suspected of committing, any crime." *Jones*, 325 F.3d at 534. Here, Michael was unarmed, and the use of force continued even after he was secured with flex-cuffs around both his hands and his feet, and lying face down on the floor, alone in a room of his parents' house. Kennedy lifted Michael up by his arms while they were bound behind his back, thereby wrenching his shoulder, and Whitley kicked Michael in the back when he cried out in pain. Thus, Kennedy and Whitley violated clearly established law in using force to seize Michael when he had committed no crime and when they had no reason to believe he was a danger to himself or others. It was especially clear that they were not entitled to use force after Michael was secured face down on the floor in handcuffs and leg restraints. Accordingly, we affirm the denial of qualified immunity on the § 1983 excessive force claim.

For the same reasons that we affirm the denial of qualified immunity on the § 1983 excessive force claim, we affirm the denial of public officers' immunity on the state common law assault and battery claim. *Glenn-Robinson*, 538 S.E.2d at 615 (holding that a citizen can sue a law enforcement officer for assault and battery if "the officer used force against plaintiff which was excessive under the given circumstances" (quotation marks omitted)); *Grad*, 321 S.E.2d at 894. With regard to the gross negligence claim, the police officers make no argument on appeal. Therefore, we consider them to have abandoned this issue on appeal. *See Edwards*, 178 F.3d at 241 n.6.

## C.

The only claim appealed by the police officers related to the September 3 event is the state law false arrest claim. Officer Kennedy argues that the arrest of Michael Bailey on September 3 was in accordance with state law. The district court held that the arrest violated state law because Kennedy was not an eyewitness to Michael's misdemeanor offenses. N.C. Gen. Stat. § 15A-401(b)(2) provides, in relevant part:

(b)    Arrest by Officer Without a Warrant. —

(1)    Offense in Presence of Officer. — An officer may arrest without a warrant any person who the officer has probable cause to believe has committed a criminal offense in the officer's presence.

(2)    Offense Out of Presence of Officer. — An officer may arrest without a warrant any person who the officer has probable cause to believe:

>    a.    Has committed a felony; or
>
>    b.    Has committed a misdemeanor, and:
>
>>        1.    Will not be apprehended unless immediately arrested, or
>>
>>        2.    May cause physical injury to himself or others, or damage to property unless immediately arrested . . . .

N.C. Gen. Stat. § 15A-401(b) (2001). Kennedy admits that Michael's offenses were misdemeanors and were committed outside of Kennedy's presence. Kennedy argues that the arrest was nonetheless lawful because N.C. Gen. Stat. § 15A-401(b)(2)(b)(2) allows an officer to arrest people who commit misdemeanors outside of his presence if that person may cause physical injury to himself or others unless immediately arrested. Kennedy argues that he had probable cause to believe that Michael might cause physical injury to himself or others because of his knowledge of the events of May 27. We held above, however, that Kennedy did not have probable cause on May 27 to believe that Michael was a danger to himself or others. Given that the events of May 27 were insufficient to give the officers probable cause to seize Michael on that date, they are *a fortiori* insufficient to constitute probable cause to believe that Michael was a danger to himself or others three months later. Moreover, an officer of reasonable intelligence would have known that arresting Michael in such a situation was contrary to his duty. Accordingly, Kennedy is not entitled to public officers' immunity on the state law false arrest claim.

## V.

For the foregoing reasons, we affirm the district court's denial of qualified immunity and public officers' immunity to the police officers. We grant the motion to dismiss the cross-appeal.

*AFFIRMED AND REMANDED FOR*
*FURTHER PROCEEDINGS*