**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 19a0494n.06

No. 18-3288

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| NICK DOLBIN, | ) | |
| | ) | |
| Plaintiff - Appellee | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| OFFICER WILLIAM J. MILLER; OFFICER | ) | NORTHERN DISTRICT OF |
| DANIEL P. WHALEN, | ) | OHIO |
| | ) | |
| Defendants - Appellants. | ) | |
| | ) | |

**FILED**
Sep 26, 2019
DEBORAH S. HUNT, Clerk

**BEFORE:  BATCHELDER, GIBBONS, and ROGERS, Circuit Judges.**

**JULIA SMITH GIBBONS, Circuit Judge.**  Officers William Miller and Daniel Whelan received a dispatch call that a young woman was reporting that her father had barricaded himself in a closet with a firearm and was actively threatening to kill himself.  After speaking to Nick Dolbin at his home, the officers' supervisor instructed that he be taken in for a mental health evaluation.  At that same time, Dolbin's wife and daughter were at the police station, reporting that Dolbin had committed acts of domestic violence and threatened to take his own life.  Though originally seized for a psychiatric evaluation, Dolbin was instead taken to the police department for booking.  He was eventually found not guilty of all criminal charges.

Dolbin subsequently filed this lawsuit, claiming, in relevant part, that the officers violated his right to be free from unreasonable search and seizure when they transported him for a mental health evaluation.  The district court found that the officers did not have qualified immunity.

Officers Miller and Whelan now appeal the court's denial of their motion for summary judgment. Because it was not clearly established that an officer lacked probable cause to seize a suspect for a mental-health evaluation based on a credible report that the suspect was actively suicidal, we reverse the district court's decision and hold that the officers are shielded by qualified immunity.

I.

On February 2, 2015, M.K., a minor, called the Strongsville Police Department to report that her father, Nick Dolbin, had barricaded himself in his closet with a gun and was threatening to commit suicide. As the district court found, "Dispatch radioed this information to the police officers. No other crime was reported." DE 18, District Op., PageID 508; DE 10-7, Miller Dep., PageID 230, 242. Officer William Miller received the dispatch report and responded to the call. Officer Daniel Whelan, who was patrolling the area in close proximity to the incident, also responded.

Dolbin had told his wife earlier that day that if he ended his life, his death would be on her conscience. He then apparently walked into his closet to get ready for the day. When he left the closet, the house phone was ringing with a call from the City of Strongsville and his wife and daughter were driving away. Surmising that someone had called 911, Dolbin waited for the police by the front door inside his home.

When the officers arrived, Dolbin placed his hands on the glass of the door in order to show that he was unarmed. Officer Whelan approached the door with his gun drawn. When Dolbin asked the officers why they were there, Officer Whelan informed him that it had been reported that he was barricaded in his closet with a gun, threatening to commit suicide. Dolbin told the offers that the report was incorrect. He reiterated that he was unarmed and was not in the master

bedroom, and that "the call that you are here for is done."  DE 10-6, Dolbin Dep., PageID 159.  After the officers observed that Dolbin was calm, Officer Whelan holstered his weapon.

Dolbin attempted to close the door, but Officer Whelan informed him that the police still needed to investigate.  Dolbin told the officers that he would not answer any more questions and requested to speak to a supervisor.  Soon after, Sergeant Thomas O'Deens of the Strongsville Police Department arrived.  Dolbin then asked to speak with the Sergeant inside.  While Officer Miller went back to his patrol car, Whelan and Sergeant O'Deens questioned Dolbin inside his home.

During Dolbin's conversation with Sergeant O'Deens, Dolbin informed the Sergeant of a comment that he made to his wife earlier that day.  Dolbin had told his wife, "[I]f I ended my life today, my death would be on your conscience."  DE 18, Dist. Ct. Op., PageID 508; DE 10-6, Dolbin Dep., PageID 150.  Still, Dolbin repeatedly told the officers that everything was fine.  According to Dolbin, he heard O'Deens report back to the station, saying, "there is nothing wrong with this guy. His eyes are not bloodshot. He's not sweating. He's not raising his voice. He is not angry. I don't think anything is really going on."  DE 10-6, Dolbin Dep., PageID 161.

After speaking with Dolbin for roughly thirty minutes, Sergeant O'Deens, who was in communication with officers at police headquarters, asked Dolbin whether he would have any issue with a mental evaluation.  Dolbin told the officers, "I'm leaving here, so it doesn't really make a difference. I'm going to respect you guys. If you feel that is what needs to be done."  DE 10-6, Dolbin Dep., PageID 162–63.  Sergeant O'Deens informed Miller that he would be transporting Dolbin for a psychiatric evaluation.  The officers then handcuffed Dolbin and took him into custody, putting him in Officer Miller's cruiser, with the intent to transport him for a mental health evaluation.

Either while Dolbin was waiting in Miller's patrol car or while driving Dolbin to the evaluation, Officer Miller received a call from Sergeant O'Deens, directing Miller to take Dolbin to the police department for booking. Unbeknownst to Dolbin or Officer Miller, Dolbin's daughter, M.K., and wife were at the Strongsville Police Department, reporting that Dolbin had committed an act of domestic violence against his wife the day before. Dolbin's wife and daughter reported that Dolbin had hit and kicked his wife in the face and thrown her down the basement stairs. They further alleged that he had held a gun to his chest and told his daughter that if anyone called the police, then he would act like everything was fine. If, however, the police attempted to enter the home, M.K. reported, Dolbin would kill her and her mother before starting a shootout with the police. According to M.K.'s report, her father was attempting to kill himself when she called 911. M.K. later recanted her allegations. Dolbin was eventually found not guilty of all criminal charges.

Dolbin originally filed this lawsuit against Officers Whelan and Miller, as well as the City of Strongsville, in the Cuyahoga County Common Pleas Court. In relevant part, he sought relief under § 1983 against Officers Whelan and Miller, alleging that they "deprived [him] of his right to be free from unreasonable searches and seizures in violation of the Fourth and Fourteenth Amendments of the United States Constitution." DE 1-1, Complaint, PageID 9. He additionally brought a failure to train claim against the City of Strongsville; a federal abuse of power claim; a federal malicious prosecution claim; and various state law claims. Defendants timely removed the case to the United States District Court for the Northern District of Ohio and moved for summary judgment.

The district court granted summary judgment on Dolbin's claim of unreasonable search and seizure based on the domestic violence arrest; the claim of failure to train against the City of

Strongsville; the false imprisonment claim against Officers Miller and Whelan; federal and state malicious prosecution claims; and federal and state abuse of power claims. The court denied summary judgment, however, as to Dolbin's claim against Officers Miller and Whelan for violating his right against unreasonable search and seizure by placing Dolbin in custody for the mental health evaluation.

The court found that there was a genuine dispute of material fact as to whether Officers Whelan and Miller had probable cause to seize Dolbin for a mental health evaluation. The district court concluded, further, that Officers Miller and Whelan were not entitled to qualified immunity even if they mistakenly believed that they had probable cause because the call from Dolbin's daughter was insufficient to give Whelan or Miller probable cause to detain Dolbin for a mental health evaluation. We do not agree. Because it was not clearly established that a police officer violated a suspect's rights by transporting him for a mental health evaluation when relying on a credible report that the suspect was actively suicidal, the officers were entitled to qualified immunity.

II.

This court reviews district court decisions denying summary judgment on the basis of qualified immunity *de novo*. *Summer v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004); *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). A grant of summary judgment is appropriate when the evidence submitted shows that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)). The moving party must demonstrate the absence of a genuine issue of material fact as to the essential elements of the non-moving party's case. *Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001). A dispute is genuine "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). This court must view the evidence in the light most favorable to the nonmoving party. *Id.* at 251.

In a case concerning qualified immunity, if genuine disputes of material fact exist as to whether the government officer's actions constituted a violation of a clearly established right, then summary judgment is inappropriate. *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017). For the purposes of an interlocutory appeal from the denial of qualified immunity, however, Officers Whelan and Miller must concede the facts as Dolbin has alleged them. *Sheets v. Mullins*, 287 F.3d 581, 585 (6th Cir. 2002).

III.

Qualified immunity shields government officials from actions seeking civil damages, so long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original).

The Supreme Court has established a two-part test to determine whether officers are entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). We must consider whether "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show that the officer's conduct violated a constitutional right." *Id.* If the officer's actions did not violate a constitutional right, then the court's inquiry ends. If, however, the alleged facts demonstrate a constitutional violation, then the court must determine "whether the right was clearly established." *Id.* Courts may exercise discretion when determining which of these

questions to address first, depending on the specific circumstances of the case. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Because we determine that there was not a clearly established right to be free from a mental health evaluation after a credible report of active suicide has been made, we decline to consider whether the officer's conduct did in fact violate a constitutional right.

A.

As a preliminary matter, Dolbin argues that this court is without jurisdiction to consider these arguments insofar as Officers Whelan and Miller claim to be entitled to qualified immunity if they had the reasonable, but mistaken, belief that they had probable cause. "It is clearly established that an officer may not [effect] a mental health seizure without probable cause." *Fisher*, 398 F.3d at 849. *See also Monday v.Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997) ("The Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others."). The district court determined that there is a genuine dispute of material fact as to whether Whelan and Miller did in fact have probable cause to seize Dolbin for a mental health evaluation.

Dolbin confuses the two issues presented in this case. The district court considered both whether Officers Whelan and Miller *actually had* probable cause and whether the officers are entitled to qualified immunity because they had the *reasonable but mistaken belief* that they had probable cause. DE 18, Dist. Ct. Op., at 7 ("[T]he central question is whether each defendant had probable cause to [seize Dolbin], or arguable probable cause such that he is entitled to qualified immunity.") In *District of Columbia v. Wesby*, for example, the Supreme Court recently considered both whether police officers responding to complaints of loud music at a vacant home had probable cause and whether they were entitled to qualified immunity because they "reasonably but mistakenly conclude[d] that probable cause [wa]s present." 138 S.Ct. 577, 591 (2018).

Here, although the district court found a genuine issue of fact material to the former issue, *Moldowan*, 578 F.3d at 369–70 (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)), it is squarely within this court's jurisdiction to consider the legal issue of whether the officers are entitled to qualified immunity based on their reasonable, but mistaken, belief that they had probable cause.

B.

As recently as this past term, the Supreme Court "stressed the need to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment,'" to deny an officer qualified immunity. *Wesby*, 138 S. Ct. at 590 (quoting *White v. Pauley*, 137 S.Ct. 548, 552 (2017) (per curiam)). Dolbin cannot identify a single controlling precedent finding a Fourth Amendment violation under similar enough circumstances to put the question beyond doubt. That failure is fatal to his attempts to defeat qualified immunity.

When determining whether a right was clearly established at the time of the alleged offense, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (citation omitted). This court may rely on precedential decisions from the United States Supreme Court, the Sixth Circuit, and the decisions of other circuit courts. *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017). The decisions from other circuits must create "a robust consensus of cases[.]" *Wesby*, 138 S. Ct. at 589–90. In evaluating this precedent, the court must consider whether, considering these cases, "it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Saucier*, 533 U.S. at 202. In support of his argument that the officers violated a clearly established right, Dolbin has cited factually dissimilar Sixth Circuit cases, as well as cases from other circuits. But none of those cases would have sufficiently notified a reasonable officer that it was unlawful under these circumstances to transport Dolbin for a mental health evaluation.

Dolbin argues that *Fisher v. Harden*, 398 F.3d 837 (6th Cir. 2005), the only controlling precedent he cites, held that "police officers lacked probable cause to arrest plaintiff for a mental health evaluation where the officers' own observations indicated plaintiff was not a danger to himself or others." CA6 R. 17, Appellee Br., at 19–20. Such a statement misrepresents the *Fisher* facts and holding. As the court explained, "The specific question at issue [wa]s whether it was clearly established at the time of Fisher's arrest that a law enforcement officer may not [effect] a mental health seizure without probable cause." *Fisher*, 398 F.3d at 846. In that case, the police had received a call from an anonymous passerby that the plaintiff, who was positioned in the middle of a field at a distance of hundreds of yards away, appeared to be tied to railroad tracks in a potential suicide attempt. *Id.* at 840–41. "Given the general level of uncertainty surrounding the veracity of such a call, it was necessary that the officers obtain other information to meet the probable cause standard." *Ziegler v. Aukerman*, 512 F.3d 777, 784 (6th Cir. 2008) (discussing *Fisher*). The police responded and ordered Fisher to walk over to their cruiser, and his doing so "immediately revealed that he was not tied to the railroad tracks as had been reported." *Fisher*, 398 F.3d at 843. He walked over to the police "in a normal fashion, and did not act out or say or do anything out of the ordinary." *Id*. at 840. As Fisher got closer, the police realized that he had a hunting rifle slung over his back and ordered him to put it down—again he complied. *Id.* Though it was apparent based on his attire that Fisher was hunting, the police ordered him to the ground and cuffed him without asking him any questions to gauge the veracity of the report. *See id.*

Those circumstances are vastly different from the circumstances Whelan and Miller encountered. Here, the report came from Dolbin's own daughter, a more credible source than a random passerby reporting an incident hundreds of yards away. The daughter's report contained concrete allegations of specific and particularized suicidal and dangerous behavior, namely that

her father had threatened suicide while holding a handgun and had then barricaded himself in a closet. That information was then radioed to the officers. That report was corroborated, at least in part, by M.K. and her mother's decision to flee the home to the police station while Dolbin was in the closet. Despite the fact that Miller and Whelan did not know that M.K. and her mother were then at the police station providing a more detailed account of the prior incidents, Sergeant O'Deens, who instructed Officer Whelan to take Dolbin to a mental evaluation, was in contact with the station officers at the time. It was then that the Sergeant asked if Dolbin would submit to a mental health evaluation. Though Whelan and Miller are not entitled to qualified immunity simply because they were following orders, this court has found that "'reasonable officers' could conclude that they have probable cause for an arrest based on 'plausible instructions' from a supervisor when 'viewed objectively' in light of their own knowledge of the surrounding facts and circumstances." *Bunkley v. City of Detroit*, 902 F.3d 552, 562 (6th Cir. 2018). Moreover, although Dolbin appeared to be calm and collected, he also told the police that he had expected his wife to call the police and further relayed a suicidal comment he had earlier made to his wife, in which he explicitly referred to killing himself. The facts in *Fisher* are not nearly similar enough to place it beyond debate that a reasonable officer would have known there was no probable cause to seize Dolbin for a mental health evaluation.

In the absence of controlling authority there must be "a robust consensus of cases of persuasive authority" for a legal principle to be clearly established. *Wesby*, 138 S. Ct. at 589–90. There is no robust consensus here. In addition to *Fisher*, Dolbin relies on *Bailey v. Kennedy*, 349 F.3d 731 (4th Cir. 2003), but one case does not create a consensus. In *Bailey*, officers responded to a 911 call from the plaintiff's neighbor reporting that the plaintiff was suicidal. *Id.* at 734. When police responded, however, the officers found nothing suggesting that Bailey was suicidal

or dangerous and yet proceeded to forcibly restrain and beat him. *Id.* Here, the identity of the caller, the nature of the reported conduct, the daughter and wife's fleeing to the police station, and Dolbin's statements to police are far more suggestive of probable cause to seize for a mental health evaluation than a neighbor's report of a single allegedly suicidal statement with no corroborating evidence. *Bailey* is plainly factually distinguishable.

In this case, although Officers Miller and Whelan may have observed Dolbin as being calm, they had also received a report from his daughter that he was actively suicidal. He had admitted to the officers' supervisor that he had made a comment to his wife that indicated that he was experiencing active suicidal ideation. Moreover, their supervisor instructed that they seize Dolbin for a psychiatric evaluation after communicating with station officers, who were receiving corroborating reports from Dolbin's wife and daughter. Faced with these troubling facts and the factual distinctions in our case law, it would not be clear to a reasonable officer that it was unlawful to seize Dolbin for the purpose of a mental health evaluation.

IV.

"It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts. . . . If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at 205. In this case, it was no doubt difficult for Officers Whelan and Miller to determine how best to proceed. Presented with a report from his own daughter that he was actively suicidal, his admission that he had made a statement that indicated he was experiencing active suicidal ideation, and arrest instructions from his supervisor, we cannot conclude that it would be clear to a reasonable officer that transporting Dolbin for a mental health evaluation violated a clearly

established constitutional right.  We thus reverse the district court's decision and hold that the officers are protected by qualified immunity.